EXHIBIT "C"

## FINDINGS OF FACT AND DECISION

Case Number:                142823

Student's Name:             John █████

Date of Birth:              April 14, 2007

District:                   21

Hearing Requested By:       Parent

Date of Hearing:            February 14, 2013
                            March 11, 2013
                            March 20, 2013
                            April 30, 2013

Actual Record Closed Date:  May 17, 2013

Hearing Officer:            Dora M. Lassinger, Esq.

C-1

Hearing Officer's Findings of Fact and Decision                                          1

Case No. 142823

---

## NAMES AND TITLES OF PERSONS WHO APPEARED ON FEBRUARY 14, 2013

For the Student:

ADRIANE GAVRONSKY, ESQ., Attorney

For the Department of Education:

NOMIKI MAKRILLOS, DOE Representative (Via Telephone)


## NAMES AND TITLES OF PERSONS WHO APPEARED ON MARCH 11, 2013

For the Student:

ADRIANE GAVRONSKY, Attorney

For the Department of Education:

DR. ROBERT MEAGHER, CSE-7 Chairperson's Designee


## NAMES AND TITLES OF PERSONS WHO APPEARED ON MARCH 20, 2013

For the Student:

ADRIANE GAVRONSKY, Attorney

JOHN █████████, Parent

ROSALIE █████████, Parent

DIANE TARANTO, Director (Via Telephone)

DENISE LORELLI, Psychologist (Via Telephone)

For the Department of Education:

DR. ROBERT MEAGHER, CSE designee

ANTHONY JAROSSI, School psychologist (Via Telephone)

DANIEL MEYER, School psychologist (Via Telephone)


## NAMES AND TITLES OF PERSONS WHO APPEARED ON APRIL 30, 2013

For the Student:

ADRIANE GAVRONSKY, ESQ., Attorney

ROSALIE █████████, Parent

C-2

Hearing Officer's Findings of Fact and Decision                    2

Case No.  142823

JOHN SCHWALL, Parent

DR. NICOLE ROBINSON, Psychologist (Via Telephone)

<u>For the Department of Education:</u>

NOMIKI MAKRILLOS, DOE Representative

C-3

_____

    The parents of John S. filed a request for an impartial hearing on December 11, 2012 seeking funding for John's placement at the Seton Foundation for Learning for the 2012-2013 school year, as well as Related Services Authorizations ("RSA's), reimbursement for the cost of an independent psychoeducational evaluation, and pendency services. (Par Ex. A).

    I was designated to hear this matter on December 12, 2012 pursuant to 20 U.S.C. Section 1415(f) (1). An impartial hearing commenced before me on February 14, 2013, on the issue of pendency. Both parties agreed that during the pendency of all due process proceedings, John would continue to receive the program recommended in his February 7, 2012 Individualized Education Program ("IEP") (Parent's Ex. B).[1] A hearing on the merits was held on March 11, March 30 and April 30, 2013. The compliance date was extended on three occasions, due to the unavailability of witnesses, and the extensive testimony and issues. The final compliance date is May 28, 2013. (IHO Ex. II, III, IV).

    John is a six year old boy with a classification of Autism. (DOE Ex. 1). His classification is not in dispute. (Tr. p. 45). He attended the Seton (Joan Ann Kennedy preschool) from the age of three. (Par. Ex. E, p. 1). Prior to that time, he received Early Intervention Services that included Applied Behavioral Analysis ("ABA"). (DOE Ex. 2, p. 2).

    As part of a "Turning 5 re-evaluation" Anthony Jarossi, a certified school psychologist conducted a psychoeducational evaluation of John on March 14, 2012, and two classroom observations in February 2012 (DOE Ex. 2). He also conducted a teacher interview at the Joan N. Kennedy Memorial Preschool. On February 15, 2012, Mr. Jarossi observed John in both group and an individual ABA sessions. During the individual session John responded to teacher re-direction and exhibited knowledge of

_____

[1] John's pendency placement consists of Placement in a Special Class at the Seton (Joan Ann Kennedy) preschool; Special Education Itinerant Teacher Services, 3 hours per week; Speech/Language Therapy ("SLT") 2 times per week for forty-five minute sessions at school and three times per week, individually, for thirty minute sessions, in a separate location; Occupational Therapy ("OT") 2 times per week for thirty minute sessions at school;   Physical Therapy ("PT") 2 times per week individually for thirty minute sessions, in a separate location. (Interim Order on Pendency).

C-4

Hearing Officer's Findings of Fact and Decision                                    4

Case No. 142823

---

some academic skills, including reading some words. (Tr. p. 34). Based upon the limited cognitive testing he was able to perform (John did not respond to the verbal items), he concluded that John has cognitive potential in at least the average range.  His basic readiness skills and early academic skills were also intact, and he was performing at the kindergarten level, with the possibility of being inhibited by language issues. (Tr. pp. 38-39).  His performance on academic scales was above his chronological age, indicating the ability to recognize and identify numbers, count, demonstrate knowledge of number concepts and identify letters and words. (DOE Ex. 2, p. 5). Mr. Jarossi reported that based upon teacher reports and a teacher interview, classroom and assessment observations, John is a pleasant and cooperative child who understands classroom rules and routines and transitions easily; that he engaged in physical stimming and does not relate to or socialize with peers.  He exhibits responsiveness to highly structured and specific learning techniques. (DOE Ex. 2, p. 5).

In a report dated January 17, 2012, John's SLT provider reported that John presented with severe receptive language delays, that he communicates using word approximations and simple gestures and that his speech intelligibility is poor.  She recommended that he receive services three times per week for thirty minute sessions. Attached to her report were five proposed IEP goals, including short-term objectives. (DOE Ex. 4).

On April 16, 2012, the Committee on Special Education ("CSE") met to recommend a program for John for the 2012/2013 school year.  Mr. Jarossi, a school psychologist, the parents, Elizabeth Dalton, a special education teacher who also served as the District Representative, Joan Barron-Archer, a school social worker, Dr. Meyer, the Director of the Joan Ann Kennedy pre-School, and both parents participated in the meeting.  (DOE Ex 1, p. 16).[2] Mr. Jarossi testified that the CSE reviewed a teacher report indicating that John had significant expressive language disabilities, including significant articulation problems.  (Tr. p. 42).

---

[2] The validity of the composition of the review team is not disputed. (Tr. p. 48).

C-5

Hearing Officer's Findings of Fact and Decision                                   5

Case No. 142823

_____

John's IEP includes the results of Mr. Jarossi's psychoeducational evaluation, as well as information provided by his teacher. It was reported that John recognizes, labels and sorts colors and shapes. That he recognizes his name in print, all the letters of the alphabets, counts by 1's and enjoys books and understands stories read in class. It also includes information provided by his speech/language therapist. (DOE Ex. p. 1). The IEP states that John functions on a pre-kindergarten level for reading and math. (Id. p. 13). According to Mr. Jarossi, there was no dispute about the reported functional levels. (Tr. p. 50).

The IEP includes a description of John's social development, as described by his classroom teacher and observed by Mr. Jarossi. It was noted that John requires individual programming with continual adult supervision that includes a specialized behavior management program in order to acquire and generalize social skills. It was reported that John's management needs can be met in the recommended program with the recommended related services. (DOE Ex. 1, p. 2) It was reported that John receives SLT inside and outside of school, and that he presents with severe receptive and expressive language delays. John's outside speech/language therapist reported that John receives a specialized multi-sensory approached aimed at increasing his speech motor function and intelligibility (PROMPT) that he has made progress with the approach and that he believes it should be continued. (DOE Ex. 1 p. 1).

John's IEP includes goals for increasing his ability to be independent in daily living skills (to a kindergarten level); increasing his ability to follow kindergarten classroom routines; increasing his ability to attend to tasks at the Kindergarten level; improve his interaction abilities at the Kindergarten level; demonstrate mastery of reading on a kindergarten level by improving his skills in the print-sound code; improve and develop number sense and numeration/numerical concept skills on a kindergarten level; and developing fine/motor/graphomotor skills to a kindergarten level. The IEP also includes 4 goals for OT (including a goal for responsivity to sensory input), 3 goals for PT and six goals for SLT, including goals for increasing jaw range and stability and improving the ability to produce various sound combinations. All of the goals include

C-6

Hearing Officer's Findings of Fact and Decision                                          6

Case No.  142823

short-term objectives, and set a criteria of 80% accuracy to be measured by teachers or providers, on a quarterly basis. (DOE Ex. 1, pp. 3-9).

The recommended program is a special class with a staffing ratio of 6:1-1, with related services of SLT (five times per week individually, in a separate location/therapy room); PT (two times per week individually in a separate location/therapy room) and OT (four times per week individually in a separate location/therapy room). All sessions are for a duration of 30 minutes. John was also recommended for a full-time crisis management paraprofessional. (DOE Ex. 1, at 10). Twelve month programming was also recommended (Id. at 11). John was recommended for alternate assessment. (Id. at 12).

Mr. Jarossi did not recall any disagreement with the recommended class placement. (Tr. p. 52). He recalled that the parent had a concern about continuation of PROMPT therapy as part of John's speech language therapy. (Tr. p. 55). He did not recall a dispute about the frequency or the duration of any of the related services. (Tr. p .56). He recalled that the parents stated their desire for John to continue to receive ABA instruction. (Tr. pp. 69-70). He testified that the goals were not created at the meeting; although there may have been a discussion of the goals which were in the progress reports. (Tr. p. 57).

Dr. Daniel Meyer, a state certified school psychologist, testified that the PS3 Annex, which was recommended for John, is a free-standing building located close to South Richmond High School.  It is a citywide program, with a twelve month school year. (Tr. p. 83). General education classes are housed in the same building. (Tr. p. 104).  The school has a bell and a loud speaker. (Tr. p. 107).

The school has two 6:1:1 classes and provides related services of SLT, OT and PT, either through DOE employees or independent contractors, who provide the services on site.  In September 2012, all of the students were receiving their recommended mandates, and a seat was available for John in each of the 6:1:1 classes. (Tr. pp. 84-85). Related services are provided on a pull-out and push-in basis.  (Tr. p. 86). John would have been provided with a crisis management paraprofessional, as provided in his IEP. (Tr. p 97).

C-7

John could have been assigned to either of the classes, both of which have an age range of five and six year olds. (Tr. p. 87). Dr. Meyer testified that the other students in the classes are also autistic; and were functioning on or about the same level as John academically. (Tr. pp. 90-91). He testified that the academic program follows the pre-kindergarten to kindergarten curriculum, including recognizing letters and numbers, matching colors, shapes and sizes and basic concepts. He described the program as being one of functional academics. (Tr. p. 91).

Dr. Meyer testified that while all of the teachers at the program are trained in ABA, the program is not an ABA program. He testified that staff use ABA techniques throughout the day with positive reinforcement for correct answers, or successive approximation toward the correct answer but not at the level of 25 to 40 hours per week, which would be regarded as the intensity level of an ABA program. (Tr. pp. 97-98, 119).

The teachers utilize the Treatment and Education of Autistic and Communication Handicapped Children ("TEACCH") method. Dr. Meyer described the daily routine which includes an instructional breakfast, morning meeting, circle time, reading, phonics and math, which is aligned to the common core standards for the DOE. They also have social skills, lunch, handwriting, music, gym and frequent movement breaks. (Tr. pp. 98-100, 119). He testified that John's goals could have been implemented at the recommended site. (Tr. p. 100). The students in the classes range in their functioning from lower than kindergarten through at or above the kindergarten level. (Tr. pp.116-117).

On cross-examination, Dr. Meyer testified that he did not know how many students attend school at the recommended site; but he stated that all of the classes are on the ground floor. (Tr. p. 104). He was not familiar with the gym at the site. The children receive OT in the class and in the halls. (Tr. pp. 109-110). Related services are provided in a cordoned off area, within the classroom, bordered by bookshelves. (Trp. 111-112). Another area, with mats, balls and PT apparatus is cordoned off for physical therapy. (Tr. p. 113).

C-8

Hearing Officer's Findings of Fact and Decision                                    8

Case No. 142823

_____

Dr. Diane Taranto, the director of the Seton Foundation for Learning, testified that she is a certified special education teacher. (Tr. pp. 128-129). The program is located on the campus of St. Joseph's Hill Academy. The program consists of six classes, with a total of forty-six students are aged 5 through 15, with a range of student with significant special needs. (Tr. pp. 130-131). The building consists of three floors. John's program is located on the second floor. The speech room is also on the second floor. The OT, PT and gym areas are on the lower level. There is a large gym, and a PT gym with equipment, including an obstacle course. The OT area has two rooms; one for fine motor skills and one for sensory skills. The fine motor area has separate work areas for three different clinicians, to prevent visual distraction and to absorb some of the sounds. The sensory area has therapy balls and swings. (Tr. pp. 143-134).

John is placed in a class of seven children with autism born in 2006 and 2007. (Tr. pp. 134, 138 ). Their curriculum is the Functional Academic Curriculum for Exception (sic) students. The classroom also uses the Assessment of Basic Language and Learning Skills (ABLLS). (Tr. p 135). John's teacher is a certified special education teacher. The assistant teacher is a level three teacher assistant, which requires some college credit. John does not have a behavior management plan. His behavior is managed through the use of effective reinforcement and adjustment of tasks to suit his skills level. Four of the students have individual paraprofessionals; however an individual paraprofessional is not assigned to John.  (Tr. pp. 137-138, 157, 162).   The teacher and assistant rotate throughout the children to assist them with activities which are laid out on the desk. (Tr. p. 139). The children all function at about a kindergarten level for reading; and from a pre-kindergarten to early first grade level for math. (Tr. p. 140).

The children's day starts with removing their coats, backpacks and placing folders where the morning folders go, using the bathroom, washing their hands, and beginning to work. (Tr. p. 139). They also have a circle time which includes greetings and calendar skills. Afterward, they work on individualized ABA programs, and on some days they might have gym or dance. After lunch, they do math and then more one-on-one ABA discreet trials. They have recess or music, reading, art or a fine motor activity, and finally

C-9

they go to centers, where the students work on social interactions. At the end of the day, the students pack up their belongings, get their coats and toilet again. Group instruction occurs during circle time, math, reading, art and in centers. (Tr. pp. 141-142).

John can attend for one to two minute in a group; and approximately five minutes during one-to-one instruction. (Tr. p. 143). He receives ABA instruction approximately one-and one-half to two hours per day, usually in a dyad. (Tr. p. 144). Lunch takes place in the classroom. John is beginning to show interest in peers. He will walk over to the other children to observe what they are doing and chase after them during recess. He is also starting to repeat some of the things that people are saying. (Tr. p. 146). In reading, he has progressed from having ten sight words to having mastered 50 sight words. He is also receptively identifying numbers to 50 and is working on identifying numbers expressively. (Tr. p. 148). He has also learned number concepts such as more or less, and his handwriting is improving. He is following directions more consistently in the classroom. Expressively he is able to repeat most things. He is initiating and requesting a few times and initiating the use of the bathroom. (Tr. pp. 148-150).

Dr. Taranto testified that John tends to be distracted by noise, but he does not act out. She testified that he has responded well to the systematic and simplified instruction and tasks, and the reinforcement provided in the program. (Tr. pp. 159, 167). During circle time, he sits directly in front of the teacher because he requires that kind if redirection; but he can be refocused and redirected with the teacher or the teaching assistant. (Tr. p. 160).

Denise Lorelli, a certified school psychologist, testified that she is the school psychologist at the Seton Foundation. (Tr. p. 170). As part of her duties, she creates and designs ABA programs for the students. (Tr. p. 171). She testified that staff performed the Quick ABLLS, to create a baseline for ABA discreet trial programs. (Tr. p. 174). Goals were then created for academics and language, to be used by John's teacher. (Tr. p. 175). She testified that data is recorded throughout the day by a teacher or assistant. (Tr. p. 176). She testified that John is making progress in all areas; specifically in his fine motor skills (from making general strokes to copying letters and numbers); in language

C-10

Hearing Officer's Findings of Fact and Decision                                    10

Case No.  142823

_____

(from making a few sounds to being able to echo or repeat what is said to him) in math, and in reading. (Tr. pp. 178-179).  He is also making progress in socialization. (Tr. p. 180) She described the classroom environment as quiet.  During ABA time, students are separated by office dividers. (Tr. p. 180).

Dr. Nicole Robison, a clinical neuropsychologist, performed an evaluation of John in December 2012 and January 2013. [3] She observed John in his classroom at the Seton Foundation and performed cognitive and educational testing.  (DOE Ex. E). She testified that he was quite distractible, even in a sound-roofed room; and was only able to maintain focus for up to one minute. (Tr. P. 245).  John's full scale IQ was in the extremely low range.  His expressive language was in the borderline range. He performed well on measures of academic achievement, with letter and word identification skills were in the very superior range.   (Tr. p. 246). His performance on other academic measures was below average, but still good, given his low IQ score.  Within his classroom, he was far more focused and appeared to be more at ease. (Tr.   p. 247).   She described the environment in his classroom as quite quiet. (Tr. p. 249).  She opined that John requires an environment with minimal sensory stimulation, such as provided at the Seton Foundation. (Tr. p. 252).

Reviewing the April 16, 2012 IEP, she disagreed with a goal for John to attend to tasks at the kindergarten level, because John is so far from attending to tasks at that level, and could not be expected to reach that level by the end of the year.  (Tr. pp. 254, 256).

Mrs. S., John's mother testified that John is very sensitive to loud sounds and large groups of people. He is afraid of heights and large objects overhead. When he is anxious he will verbally stim and moan. He is prone to running in circles with his hands over his ears. (Tr. p. 197). John is easily distracted. He is sensitive to light. He has to wear sunglasses and hats in direct sunlight. He needs to work in a dimly lit area. (Tr. p.

_____

[3] By letter dated November 19, 2012, the mother informed the CSE that she disagreed with the DOE's psychoeducational  evaluation, which was performed in February /March 2012, that she was arranging for an Independent Psycho-educational evaluation, and that she reserved the right to seek reimbursement for the independent evaluation "at the DOE's expense". (Par. Ex. D).  No evidence was presented regarding the cost of the evaluation. There is no indication in the record that the DOE ever initiated an impartial hearing to show that its evaluation was appropriate or that the parent's evaluation does not meet the school district criteria.

C-11

Hearing Officer's Findings of Fact and Decision                    11

Case No.  142823

198).  John cannot tolerate sugar and wheat and has a sensitivity to eggs.  (Tr. p. 199).
She testified that during preschool, John was receiving OT, SLT, PT and SEIT and had a
paraprofessional. (Tr. p. 199).  Services were provided at school and at therapy centers.
ABA methodology was used to instruct John and he made progress in his expressive
language, dressing, social and academic skills. (Tr. p. 200).

During preschool, John received OT twice each week at a sensory gym, where he
used swings, ball pits, and sensory balls and practiced fine motor skills. (Tr. p. 201).  He
received SLT at school three times per week and outside, at a therapeutic center twice
each week. (Tr. p. 202).

Mrs. S. testified that she participated in the April 16, 2012 IEP meeting. She
brought the OT report to the meeting; but it was not reviewed, and that John's sensory
needs were not discussed. [4]Nor was there a discussion of goals. (Tr. pp. 205, 208). She
informed the committee that ABA was a program that worked for John.  Following the
meeting, Mrs. S. called Mr. Jarossi to discuss her concerns about the PROMPT
methodology being placed on the IEP, and about the SLT mandates that were discussed at
the meeting. (Tr. pp. 205-207).  She testified that other than her concerns about the
PROMPT, she agreed with the IEP; and felt that the 6:1:1 class was a good framework
which worked for John. (Tr. p. 225). She also agreed with the recommended amount of
OT, and the need for a one-to-one paraprofessional. [5]She informed the CSE that she had
visited a District 75, 6:1:1 program; and that she was concerned that John's sensory needs
would not be met there. (Tr. p. 228). She did not discuss the possibility of John attending
the Seton Foundation for September 2012 at the CSE review. (Tr. p. 220).

She received a final notice recommending P3 and went to visit the recommended
site on June 6.  (Tr. p. 227). Mr. Gillis, the teacher she met with, told her there would be a
kindergarten class; however he was unable to show it to her, as he was teaching a fifth

---

[4] Judith DeProspo, the author of the OT report, recommended continuation of OT three times per week for
thirty minute sessions, individually, with access to large pieces of equipment for movement stimulation and
various media for tactile input. (Par. Ex. H).  The IEP includes a summary of the OT report, and a statement
that the parents are particularly concerned about his sensory and gross motor deficits. (DOE Ex. 1, p. 2).
[5] When school started, however, she found that he was able to function very well without the individual
paraprofessional. (Tr. p. 226).

C-12

grade class at the time. (Tr. pp. 208-209). She described the classroom as small, with desks scattered about; and an area in the back, cut in half by the bookshelves, where the therapies were taking place. Mr. Gillis told her that the therapies would take place in the classroom, as described by Dr. Meyer, and sometimes in the hall. (Tr. p. 211). She saw a large sensory ball. The bathroom was down the hall from the classroom.  She was told that the students had to use the bathroom at a certain time. (Tr. p.  212). She believes there were 150 to 200 students in the building. The building did not have a gym.  Mr. Gillis informed her that they do not do ABA discreet trials. (Tr. pp. 212-213).

On June 7, 2012, Mrs. S. wrote to Ms. Donnellan, the CSE Chairperson, rejecting the recommended placement stating that she was placing John at the Seton Foundation. She stated that she was requesting pendency, all related services and transportation; and that she planned to invoke her due process rights. The letter does not indicate why she was rejecting the recommended site, or that she planned to seek tuition reimbursement. (Par. Ex. C; DOE Ex. 8). At the hearing, she expressed her concerns that the site was noisy, that there were a lot of children going up and down the hallway, which would be a distraction for John; that therapies took place in the back of the classroom, which would be distracting for John and that he would not have easy access to a bathroom, when he was not yet toilet trained. (Tr. pp. 214-215). She described his progress at the Seton Foundation. (Tr. p. 215).

She testified that John receives all of his therapies, on site, at the Seton Foundation, and outside of school, pursuant to RSA's, in the amount provided in the Order of Pendency. The Seton Foundation does not provide the related services. (Tr. pp. 216-217). John attends school from 8:30 AM to 2:30 PM. (Tr. pp. 276-277).

On September 5, 2012, the parent signed a contract enrolling John at the Seton Foundation for Learning for the 2012/2013 school year, with an annual tuition of $36,000.  (Par. Ex. G).  The parents presented proof of payment of $9,000.00, as of the hearing; and Mrs. S. testified that they are up to date in their tuition payments (Par. Ex. G; Tr. p. 227).

C-13

Hearing Officer's Findings of Fact and Decision                    13

Case No.  142823

_____

## PARENT'S POSITION

The parents' position is that the April 16, 2012 IEP is inappropriate because the goals were not discussed at the meeting and because the CSE failed to consider John's sensory needs, depriving the parents of meaningful discussion during the CSE meeting. The parents also argue that John's IEP, which recommended that all of his related services be provided at a separate location therapy room could not be implemented at the recommended site, where he would receive the therapies within the classroom. They state that the school environment would be a "complete sensory overload" for John. (Tr. pp. 279-281). Finally, the parents argue that the fact that the Seton Foundation did not provide related services (but did provide therapy rooms for John to receive his services from outside providers) is not dispositive. (Tr. p. 283).

The hearing request includes a claim for compensatory related services, however no evidence was presented in support of this claim. In their hearing request, the parents also requested reimbursement for the cost of an Independent Psychoeducational evaluation; however, no evidence was presented regarding the cost of the independent evaluation obtained by the parents.

## DOE POSITION

The DOE's position that it satisfied the procedural requirements set forth in the IDEA and that the proposed placement would have been able to meet John's needs. (Tr. p. 286). The DOE also argues that the recommended program is inappropriate and that equitable considerations do not favor the parent, as they never intended to place the child in a public school environment. (Tr. pp. 287-288).

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

The school district bears the burden of proving the appropriateness of the recommended program.  Education Law 4404(1). The school district must comply with the procedural requirements of the Individual with Disabilities Education Act. (IDEA), and the IEP developed through its CSE must be reasonably calculated to enable the student to receive educational benefits. (Board of Educ. v. Rowley,  458 U.S. 176 [1982]. A Board of Education may be required to pay for educational services obtained for a child

C-14

by the child's parents, if the services offered by be Board Of Education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim. (School Committee of the Town    of Burlington v. Department of Education, Massachusetts, 471 U. S. 359 (1985). The fact that the facility selected by the parents to provide special education services to the child is not approved as a school for children with Florence disabilities does not preclude an award of reimbursement. (Florence School District Four  et al. V. Carter by Carter , to 510 US. (1993).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs and provides for the use of appropriate special education services. Application of a Student with a Disability, Appeal No. 11-162 (citations omitted). An appropriate public education under IDEA is one that is "likely to produce progress, not regression". Id. (citing Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F. 3d 245, 248 (3d Cir. 1997).

In evaluating whether a school district has complied with the procedural requirements of the IDEA, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies (I) impeded the child's right to a free and appropriate public education, (II) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a free and appropriate education, or (III) caused a deprivation of educational benefits. 20 U.S.C. Sec. 1415(f) (3) (e) (ii).

An IEP must include a statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability and to enable the student to be involved in and make progress in the general education curriculum. Application of the Board of Education, Appeal No. 11-007, p. 21 (citing 8 NYCRR 200.4[d][2][iii]). Although the record indicates that John's IEP goals were not discussed at the meeting, the parent testified that when she reviewed the IEP, she did not disagree with the recommended goals or program. Her only concern was that the IEP did not specifically provide for continuation of PROMPT therapy.

C-15

Hearing Officer's Findings of Fact and Decision                                    15

Case No. 142823

---

I find that the goals are appropriate and consistent with John's needs, with the exception of the goal that John increase his ability to attend at the kindergarten level, which was not consistent with John's abilities. Although the SLT goals do not specifically mention PROMPT therapy, the IEP notes that John has benefited from this type of therapy. The IEP includes six SLT goals, consistent with those recommended by his therapists, including two goals addressed to his ability to produce sounds; and one goal which specifically addressed oral motor functioning.

For all of the foregoing reasons, I find that any deficiency in John's goals did not rise to the denial of FAPE. I further find that the recommended program is substantively appropriate because (1) the parent agreed with the recommended program and (2) the recommended staffing ratio is similar to what John actually receives, and which I find to be appropriate.

## RECOMMENDED SITE

I find that the DOE failed to demonstrate that the recommended program could be implemented at the recommended site. See T.Y., K.Y. on behalf of T.Y., v. New York City Department of Education, 584 F. 3d 412 (2d Cir. 2009). John's IEP provides that all of his related services are to be provided in a "separate location therapy room". The record indicates that at the recommended program, John would receive all of his therapies in a cordoned off area of the classroom or in the hallway. I find that this constitutes a significant deviation from John's IEP, which provides for 11 sessions of related services per week. The record indicates that John is extremely distractible, and that the school's inability to provide him with a separate therapy room for his related services, as provided in his IEP, resulted in a denial of FAPE.

## APPROPRIATENESS OF PARENTAL PLACEMENT

To qualify for funding under the IDEA, the parents must demonstrate that the parental placement provides "educational instruction specially designed to meet the unique needs of a handicapped child supported by such services as are necessary to permit the child to benefit from instruction." See Frank G. v. Bd. Of Educ. Of Hyde Park,

C-16

Hearing Officer's Findings of Fact and Decision                                    16

Case No. 142823

459 F. 3d 356, 365 (2d Cir. 2006) (citing Rowley). cert. denied, Board of Educ. Of Hyde Par, v. Frank G. 128 S. Ct. 436 (2007).

I find that the parent demonstrated that the Seton Foundation provides John with an appropriate educational program designed to meet his unique needs. John is educated in a small class, with support from a special education teacher, and a teacher's assistant, utilizing an ABA format, including discreet trials. The school provides separate therapy rooms and a gym. The school program combined with the related services recommended in the April 16, 2012 IEP provides John with an appropriate educational program. The school environment is quiet and consistent with John's sensory needs. During the current school year, John has progressed in his academic, language, fine motor and social skills. M.H. and E.K. v. New York City Dept. of Education, 685 F. 3d 217, 254 (2d Cir. 2012) supports the parents' position that the fact that the school is not the provider of related services does not mean that it is inappropriate.

## EQUITABLE CONSIDERATIONS

In determining whether equitable considerations support a request for reimbursement, the courts will consider whether the parents have cooperated with the school district throughout the process to ensure that their child receives a FAPE. Bettinger v. New York City Bd. of Educ., 2007 WL 4208560 [S.D.N.Y. Nov. 20, 2007].

Tuition reimbursement may also be reduced or denied, if the parents neither inform the CSE of their disagreement with the proposed placement, including stating their concerns and their intent to place their child in a private school at public expense at the most recent CSE meeting prior to their removal of the child from public school, nor provide the school district with written notice of such information ten business days before such removal. 20 U.S.C. Sec. 1412[a][10][C][iii][I]; Application of the BOARD OF EDUCATION, Appeal No. 08-084. The purpose of the notice requirement is to give the district a meaningful opportunity to minimize its expenses by developing its own IEP that would provide the child with a FAPE within the School District. J.S. and A.G. v. Scarsdale Union Free School District, 111 LRP 73958 (U.S.D.C, S.D.N.Y., 2011) (citing

C-17

Hearing Officer's Findings of Fact and Decision

17

Case No. 142823

---

W.M. o/b/o O.M. v .Lakeland Central School District, 783 F. Supp. 2d 497 (U.S.D.C., S.D.N.Y. 2011).

The record indicates that while the parents participated in the CSE review and went to view the proposed site, they did not communicate their concerns regarding the recommended site or their intention to enroll John at the Seton Foundation at public expense either at the most recent CSE review, or in their letter to the CSE in June 2012. While they notified the CSE that they were placing John at the Seton Foundation and requested related services and transportation, they never informed the CSE why they disagreed with the placement; and that they were seeking public funding for their placement.   Contrary to the DOE's argument, however, there is no evidence that the parents never intended to place John in a public school environment.

I find that the foregoing equitable considerations warrant a 10% per cent reduction in tuition reimbursement Wood v. Kingston City School District, 55 IDELR 132 (N. D. N. Y. 2010).

I find that the tuition charged by Seton Foundation is appropriate, taking into account the small class size and the specialized nature of the instruction provided.

**REQUEST FOR REIMBURSEMENT FOR INDEPENDENT EVALUATION**

Parents are entitled to an independent education evaluation ("IEE") at public expense if they disagree with the DOE's evaluation. 8 NYCRR 200.5(g)(1).  If a parent requests an IEE at public expense, the school district must, without unnecessary delay, ensure that either an IEE is provided at public expense or initiate an impartial hearing to show that its evaluation is appropriate or that the evaluation obtained by the parent does not meet school district criteria. 8 NYCRR 200.5[g][1][iv]. Application of a Student with a Disability, 11-001.  As the DOE never initiated an impartial hearing to challenge the parent's request for an IEE, the parent was entitled to an IEE at DOE expense. Nevertheless, inasmuch as no evidence was presented regarding the cost of the parents'

C-18

Hearing Officer's Findings of Fact and Decision                    18

Case No. 142823

_____

IEE, or the reasonableness thereof, I find that reimbursement should be limited to the DOE rate for independent psychoeducational evaluations.[6]

**ORDER**

     Therefore, it is hereby ordered that the DOE shall:

     (1) Reimburse the parents for John's tuition at the Seton Foundation for Learning, for the 2012-2013 school year reduced by ten (10%) upon presentation of proof of payment thereof.

     (2) Continue to provide John with the related services recommended in the April 16, 2012 IEP, pursuant to RSA's, for the balance of the 2012-2013 school year.

     (3) Reimburse the parents for the cost of their IEE, up to the amount allowed by the DOE for such evaluations, upon presentation of proof of payment thereof.

     The parents' claim for compensatory related services is denied.

Dated:  May 28, 2013

_Dora M. Lassinger, Esq._

DORA M. LASSINGER, ESQ.
Impartial Hearing Officer

DML:gc

_____

[6] In her letter requesting the evaluation, the parent stated that she was seeking an independent Psycho-educational evaluation.

C-19

Hearing Officer's Findings of Fact and Decision

19

Case No. 142823

---

## PLEASE TAKE NOTICE

Within 35 days of the date of this decision, the parent and/or the New York City Department of Education has a right to appeal the decision to the State Review Officer of the New York State Education Department under Section 4404 of the Education Law and the Individuals with Disabilities Education Act.

"The notice of intention to seek review shall be served upon the school district not less than 10 days before service of a copy of the petition for review upon such school district, and within 25 days from the date of the decision sought to be reviewed. The petition for review shall be served upon the school district within 35 days from the date of the decision sought to be reviewed. If the decision has been served by mail upon petitioner, the date of mailing and the four days subsequent thereto shall be excluded in computing the 25- or 35-day period." (8NYCRR279.2[b]) Failure to file the notice of intention to seek review is a waiver of the right to appeal this decision.

Directions and sample forms for filing an appeal are included with this decision. Directions and forms can also be found in the Office of State Review website: www.sro.nysed.gov/appeals.htm.

C-20

Hearing Officer's Findings of Fact and Decision                                    20

Case No.  142823

---

## DOCUMENTATION ENTERED INTO THE RECORD

### PARENT

A        Impartial Hearing Request, dated 12/11/12, 8 pages

B        IEP, dated 4/16/12, 15 pages 16 16

C        Letter to Claire Donellan, dated 6/12/12, 1 page

D        Letter to Mr. Haddad, dated 11/19/12, 2 pages

E        Neuropsychological Report, dated 12/12 and 1/13, 12 pages

F        Seton Foundation Report, dated 2/1/13, 4 pages

G        Tuition Contract, 9/5/12., 4 pages

H        OT Evaluation, 1/2/12, 10 pages

I         OT Progress Report, 1/2/12, 5 pages

J        Related Service Progress Report, 2/1/12, 2 pages

K        Seton Foundation Class Schedule, 2012/2013, 1 page

L        Notice of Recommendation, 2/7/12, 2 pages (re-designated as former C)

### DEPARTMENT OF EDUCATION

1        IEP, 4/16/12, 16 pages

2        Psycho-educational Evaluation, 3/14/12, 6 pages

3        Classroom Observation, 2/17/12, 1 page

4        Speech Report, 1/17/12, 6 pages

5        Speech Report, 1/26/12, 3 pages

6        Teacher Report, 1/16/12, 3 pages

7        FNR, 5/21/12, 1 page

8        Parent Letter, 6/13/12, 1 page

### IMPARTIAL HEARING OFFICER

1        Pre-hearing Conference Summary, 1/15/13, 1 page

2        Case Follow-Up Sheet, 2/14/13, 1 page

3        Case Follow-Up Sheet, 3/20/12, 1 page

4        Case Follow-Up Sheet , 4/3013, 1 page

C-21